**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHER DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JOHN DOE | ) |
| | ) |
|     Plaintiff, | ) |
| | ) Case No. 1:22−cv−583 |
| v. | ) |
| | ) **Jury Trial Demanded.** |
| THE BOARD OF EDUCATION | ) The Honorable Judge Robert M. Dow |
| OF THE CITY OF CHICAGO, | ) |
| A MUNICIPAL CORPORATION, | ) |
| JOHN THUET, JOHN JOHNSON, | ) |
| PAT GORDON, DONOVAN ROBINSON, | ) Magistrate Judge Beth W. Jantz |
| LAURA LEMONE, LATANYA MCDADE, | ) |
| CAMIE PRATT, JANICE JACKSON, | ) |
| XOCHILT ROJAS, | ) |
| AND DEBRA SPRAGGINS, | ) |
| (IN THEIR INDIVIDUAL CAPACITIES) | ) |
| | ) |
|     Defendants. | ) |
| | ) |

## FIRST AMENDED COMPLAINT

NOW COMES Plaintiff, John Doe, complaining of Defendants, the Board of Education of the City of Chicago, a municipal corporation, and John Thuet, John Johnson, Pat Gordon, Donovan Robinson, Laura Lemone, Latanya McDade, Camie Pratt, Janice Jackson, Xochilt Rojas, and Debra Spraggins. Plaintiff alleges the following:

## STATEMENT OF THE NATURE OF THE CASE

1.    Plaintiff is a former Lincoln Park High School ("LPHS") student and former basketball player for the 2019-2020 school year. Plaintiff was one of the faces of this incredibly successful basketball teams and a model Chicago Public School student, until he reported certain members of the basketball team for sexual assault. In so doing, the wrath of the school was placed upon Plaintiff, who the team members believed jeopardized the entire team and season. This

1

reaction revealed the lack of protections that existed in Chicago Public Schools. Plaintiff faced extreme harassment and repeated retaliation and bullying. He went from being a face of the program to being shunned and benched. All of the aforementioned harassment was reported to Chicago Public Schools who – in an effort to protect the popularity and ability of team to continue – did nothing to protect Plaintiff and ratified the methodical and vindictive plan of retaliation known and endorsed by the Defendant Board of the City of Chicago and its officers. The failure by the officers of Defendant the Board of Education of the City of Chicago ("Defendant Board") to support Plaintiff and protect his identity after reporting sexual misconduct led to Plaintiff experiencing significant harassment and isolation from his former teammates on the basketball team. He also lost significant exposure to opportunities to play basketball at the collegiate level, due to LPHS coaches isolating him and not advocating to colleges for him. Defendant did not play again for the team, and was forced to transfer schools, leaving his friends and school behind at the worst time. In addition to the social and athletic difficulties Plaintiff faced, the transfer created problems relative to how his grade point average was calculated. This case is now brought to seek redress for retaliation for reporting an incident prohibited by Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. § 1681.

2.    Plaintiff has filed this Complaint under a pseudonym for the reasons stated in the filed Motion to Proceed under a Pseudonym.

## JURISDICTION AND VENUE

3.    Jurisdiction is proper under 28 U.S.C. § 1331, which provides federal courts jurisdiction over all claims arising out of the Constitution, treaties, and laws of the United States.

4.    Jurisdiction over the Plaintiff's state law claims is proper under 28 U.S.C § 1367 as they arise out of the same set of facts and circumstances as Plaintiff's federal law claims.

5.      Venue is proper under 28 U.S.C. § 1391(b)(1) as a substantial part of the events giving rise to the Plaintiff's claim occurred in this judicial district.

**<u>PARTIES</u>**

6.      Plaintiff John Doe is a former student of Lincoln Park High School, and former basketball player for the Lincoln Park High School Boys' Basketball Team. Plaintiff shall turn nineteen (19) on May 19, 2022.

7.      Plaintiff is an Illinois citizen attending college out of state, who returns home during breaks from school.

8.       Defendant Board is an Illinois Municipal Corporation which oversees Chicago Public Schools ("CPS") which is the former employer of multiple administrators and staff involved in this matter. Defendant Board maintains offices at 1 N Dearborn Suite 950, Chicago, Illinois, 60602.

9.      Defendant John Thuet ("Thuet") is being sued in his individual capacity for his actions as interim principal of Lincoln Park High School, for intentional infliction of emotional distress, for willful and wanton misconduct relating to his deliberate indifference to the harassment of John Doe, for concealment of information and reporting of sexual misconduct, and for failure to supervise the basketball coaches and team. John Thuet is a resident of Chicago, Illinois.

10.     Defendant John Johnson ("Johnson") is being sued in his individual capacity for his actions as dean of Lincoln Park High School, for intentional infliction of emotional distress, for willful and wanton misconduct relating to his deliberate indifference to the retaliation against Plaintiff, and for the concealment of the student harassment of John Doe. John Johnson is a resident of Chicago, Illinois.

11.     Defendant Pat Gordon ("Gordon"), the former Lincoln Park High School Boys' Basketball coach, is being sued in his individual capacity for intentional infliction of emotional distress and for facilitating and encouraging harassment and retaliation against John Doe.

12.     Defendant Donovan Robinson was the interim coach of the Lincoln Park High School Boys' Basketball team and is being sued in his individual capacity for intentional infliction of emotional distress and for facilitating and encouraging harassment and retaliation against John Doe at the behest of former Coach Gordon.

13.     Defendant Laura Lemone ("Lemone") is being sued in her individual capacity for willful and wanton misconduct and for failure to supervise John Thuet and the staff of Lincoln Park High School. As Network Chief, she had direct supervisory authority over John Thuet. Defendant Lemone maintains offices at: 110 N. Paulina, Chicago, Illinois, 60612.

14.     Defendant Latanya McDade ("McDade"), the former Chief Education Officer of CPS is being sued in her individual capacity for willful and wanton misconduct and for failure to supervise Laura Lemone, John Thuet, Camie Pratt, and the staff of Lincoln Park High School. Defendant Latanya McDade is now the superintendent of Prince William County Public Schools in Virginia and upon information and belief maintains residence in that county.

15.     Defendant Camie Pratt ("Pratt") is upon information and belief the Chief Title IX Officer for CPS and is being sued in her individual capacity for willful and wanton misconduct and for failure to properly supervise the investigations of harassment against John Doe due to his reporting of sexual misconduct. Pratt maintains offices at 110 N. Paulina St, Chicago, IL 60612.

16.     Defendant Janice Jackson ("Jackson"), the former Chief Executive Officer of CPS, is being sued in her individual capacity for willful and wanton misconduct and for failure to supervise LaTanya McDade, Laura Lemone, John Thuet, Camie Pratt, the staff of Lincoln Park

High School, and various CPS employees. Defendant Janice Jackson, upon information and belief, resides in Chicago, Illinois, 60602.

17.     Xochilt Rojas ("Rojas"), a former investigator in CPS' Office of Student Protection, is being sued in her individual capacity for willful and wanton misconduct and for failure to properly supervise the investigations of harassment against John Doe due to his reporting of sexual misconduct. On information and belief Rojas resides in Chicago, Illinois.

18.     Debra Spraggins ("Spraggins"), the former director of investigations at CPS' Office of Student Protection is being sued in her individual capacity for willful and wanton misconduct and for failure to properly supervise the investigations of harassment against John Doe due to his reporting of sexual misconduct. Upon information and belief, Spraggins resides in Chicago, Illinois.

**FACTS**

The Roundball Classic Tournament.

19.     During the 2019-2020 school year, the Lincoln Park High School Varsity Boys' Basketball team (the "basketball team") was an elite team, ranked at the top of the Chicago Public School league as well as ranked near the top ten of high school teams within the entire state of Illinois. Plaintiff was an important part of the team, a starter, and one of the faces of the program. This provided Plaintiff with exposure to colleges, and from the Defendants' perspectives, provided increased publicity and elevated the reputation, notoriety, and name recognition of the school.

20.     On December 11, 2019, head basketball coach Pat Gordon ("Gordon") informed the basketball team that a planned trip to Florida for basketball tournament had been cancelled due to logistical issues.

21.     On December 12, 2019, Gordon informed the team they would instead play in the Motor City Roundball Classic in Detroit, Michigan, between December 27 and 29, 2019.

22.     Upon information and belief, Gordon submitted paperwork to CPS regarding the trip; but due to it being submitted late, it was not approved.

23.     Nonetheless, Lincoln Park High School officials, including John Thuet ("Thuet"), the interim principal of Lincoln Park High School, knew about and authorized the trip.

24.     The basketball team arrived in Detroit on December 27, 2019 and played games on December 27 and December 28. Updates on the team and scores of the games were reported on the LPHS Basketball Twitter feed, an account that claimed to be associated with the team.

25.     Copies of the tweets in question are attached as Exhibit A to the Complaint.

The Sexual Misconduct.

26.     On the evening of December 28, 2019, three members of the basketball team had sex with the team's female manager, Jane Doe. Jane Doe was a minor at the time of the incident.

27.     Jane Doe consented to having sex with one of the boys (also a minor; hereinafter referred to as "John Doe II") but was unaware he switched places with two other boys (also minors; hereinafter referred to as "John Doe III" and "John Doe IV"), and thus was unable to consent to sex acts with those two other boys.

28.     A video was recorded of at least part of this sexual encounter with Jane Doe. That video was shared amongst LPHS students on social media.

29.     The following morning, two of the boys who engaged in sex acts with Jane Doe told members of the basketball team, including John Doe, of their sexual contact with Jane Doe and bragged that Jane Doe did not know that John Doe III and John Doe IV had engaged in sexual activity with her.

30.     Later that day, Plaintiff and John Doe V informed their fathers separately of the sexual assault. They told their fathers that three members of the basketball team had sex with Jane Doe and that Jane Doe was unaware of having had sex with two of those individuals.

31.     At the same time, Marcus Spencer ("Spencer") drove at least one of the three team members who had engaged in sexual activity with Jane Doe to the same restaurant.

32.     During that drive, Spencer learned that the three boys engaged in sex with Jane Doe.

33.     Upon information and belief, he also learned that there was a video made of the sexual misconduct.

34.     At the restaurant, Spencer confirmed what Plaintiff told his father when he stated to Plaintiff's father that multiple students had sex with Jane Doe. While that was known, Spencer did not report the incident (including the fact that there were minors involved, and that a video existed), and thus John Does II, III, and IV had no suspension from any games.

Report of the Misconduct

35.     On December 30, 2019, John Doe V's father left a message reporting the sexual misconduct perpetrated against Jane Doe to CPS' Office of Student Protection (hereinafter "OSP").

36.     On December 31, 2019, Plaintiff's father emailed John Thuet, Interim Principal of Lincoln Park High School, on behalf of himself and Plaintiff and John Doe V's father, requesting a meeting about the sexual misconduct in Detroit. A copy of that email is attached as Exhibit B to the Complaint.

37.     On January 2, 2020, Plaintiff's father and John Doe V's father met with Thuet to discuss the sexual misconduct in Detroit.

38.     At this meeting, Thuet informed Plaintiff's father and John Doe V's father that the Detroit trip was not a school authorized trip.

39.     In a follow-up email, Thuet informed Plaintiff's father and John Doe V's father that he had submitted his report to OSP on January 3, 2020.

40.     In that email, Thuet indicated that OSP was unsure if the report could be kept anonymous. A copy of that email is attached as Exhibit C to this Complaint.

41.     On January 3, 2020, Debra Spraggins, director of the OSP investigations, received notice of the sexual assault of Jane Doe. She assigned Xochitl Rojas, an OSP investigator, to investigate the sexual assault.

42.     The OSP Defendants should have known or knew about the potential for harassment and retaliation against Plaintiff.

43.     The following week, OSP began an investigation into the sexual misconduct. That it took OSP a week to begin its investigation is a failure that jeopardized student safety.

44.     Plaintiff was interviewed by OSP. OSP did not notify his parents of the time or place for the interview, nor provide them with an option of appearing with their child during such stressful circumstances. Instead his father, who was at work and had to excuse himself from a meeting, attended Plaintiff's interview by phone.

45.     On January 9, 2020, Thuet sent a letter to parents of the LPHS Boys' Basketball team, informing them of that the basketball team had taken an unauthorized trip to Detroit. Further, Thuet stated that as a result, the staff person who organized the trip had been removed from his position, and Donovan Robinson would be named interim coach of the basketball team. A copy of that letter is attached as Exhibit D to the Complaint.

46.     Although not identified by name, the removed individual was the basketball coach Pat Gordon.

47.     Despite being removed from his position, Gordon continued to communicate with the LPHS Boys' Basketball team and Lincoln Park administration by text message.

48.     Plaintiff's father informed Thuet of these text messages via email on January 13, 2020. A copy of the email sent and relevant text messages are attached as Exhibit E to this complaint.

Harassment and Retaliation.

49.     At some point prior to January 8, 2020, Gordon revealed to one or more of the basketball team members that Plaintiff was involved in revealing the sexual misconduct to OSP. Gordon told the basketball team members to deny the allegations and not to cooperate with the investigation. Other Lincoln Park basketball coaches were present as well, and expressly and/or impliedly ratified the actions and directives of Gordon.

50.     Thuet was aware of these communications and either did not report them to his supervisors or if he did, his supervisors, which include Laura LeMone ("LeMone"), Chief of Schools for Network 14, took no actions to protect Plaintiff.

51.     On January 8, 2020, prior to a game against North Lawndale, interim basketball coach Donovan Robinson informed Plaintiff that because of Plaintiff's report and the ultimate termination of Gordon, Robinson didn't have confidence in him and that he would not play.

52.     Prior to the reporting of the sexual misconduct, Plaintiff was a starter on the team, and started every game, playing significant minutes in every basketball game prior to the event and was told that he was improving.

53.     Plaintiff's father shortly thereafter informed Lincoln Park Administrators of the harassment, which the entire coaching staff was aware of, thus putting CPS on notice.

54.     On January 10, 2020, Robinson continued the Defendants' collective retaliation and informed the team that Plaintiff and John Doe V had reported the sexual misconduct.

55.     After that, in addition to being benched, Plaintiff also began experiencing significant isolation from other members of the basketball team.

56.     Upon information and belief, OSP received text messages indicating that there was student-on-student retaliation and harassment at latest on January 16, 2020.

57.     Rojas and Spraggins, the OSP investigators, despite receiving text messages at latest on January 16, 2020 that Plaintiff was being subjected to threats and harassment, did not begin further inquiry into the reports until January 30, 2020. This willful and wanton failure to protect the wellbeing of Plaintiff placed him in significant risk of further emotional harm.

CPS Response to the Harassment.

58.     As Plaintiff's father grew increasingly alarmed about the toxic nature of the basketball team and the impact on Plaintiff, including harassment and threats Plaintiff received from his teammates, the manner in which the issues that arose during the Detroit trip were being addressed, and the unreasonably delay in the investigation into the threats of violence against his son, he arranged a call with Thuet on January 17, 2020.

59.     During the call with Thuet, Plaintiff's father discussed with Thuet the threats that Plaintiff received, as well as the retaliatory harassment directed towards him.

60.     Plaintiff's father informed Thuet that as a result of the harassment and its impact on Plaintiff, he was considering transferring Plaintiff.

10

61.     Although Thuet was fully informed of the retaliation against and harassment of Plaintiff, Thuet declined to take any action specific action, including any action in opposition to the reduction in playing time, and downplayed the retaliation and harassment in reporting to OSP. In doing so, Thuet condoned the retaliation and harassment, and allowed it to continue, thereby leaving Plaintiff to be victimized and traumatized further from the reporting of the incident of sexual misconduct.

62.     Despite being informed, CPS took no action.

63.     CPS and Thuet's inactions resulted in a violation of CPS' anti-bullying policy. A correct copy of the policy is attached as Exhibit F to this complaint.

64.     In a January 21, 2020 follow-up email, Plaintiff's father informed Thuet that he would be reaching out to OSP regarding the harassment.

65.     A copy of that email is attached as Exhibit G to this complaint.

66.     January 21, 2020 Plaintiff's father sent an email to Aneita Williams, CPS Title IX Officer of Sports ("Williams") regarding the harassment discussed with Thuet.

67.     A copy of that email is attached as Exhibit H to the Complaint.

68.     Williams responded on January 22, 2020 that the OSP would be looking into the harassment against Plaintiff.

69.     One week later, following a lack of response from OSP to Plaintiff's or John Doe V's reports, John Doe V's father pursued the issue by emailing Defendant Janice Jackson.

70.     Only after that, on January 30, 2020, did OSP investigators meet with Plaintiff's father and John Doe V's father.

71.     At that time, via email and letter, OSP informed Plaintiff's father that they were opening an investigation into the harassment and retaliation against Plaintiff.

11

72.     Copies of the letters and emails are attached as <u>Exhibit I</u> to this Complaint.

73.     On January 31, 2020 Robinson was suspended and Thuet and Michelle Brumfield, the Assistant Principal at LPHS, were removed from their positions for allegedly downplaying allegations of retaliation and harassment involving Plaintiff, John Doe V, and a number of other students.

74.     Also on January 31, 2020, the Lincoln Park Boys' Basketball season was cancelled.

75.     On February 3, 2020, CPS held a community meeting in which basic details were given as to the investigations into harassment and misconduct and it was revealed that there were four ongoing investigations.

76.     Thereafter, the verbal harassment against Plaintiff continued to escalate, and an online petition began to circulate to allow the Boys' Basketball season to resume.

    The John Williams Show.

77.     On February 4, 2020, Marcus Spencer, the former assistant LPHS basketball coach, appeared on the John Williams Show on WGN Radio with his attorney Richard Lenkov and a member of the basketball team.

78.     On air, Spencer stated that CPS knew of the trip to Detroit for the Motor City Roundball Classic Tournament but did not approve of it because of paperwork being filed late.

79.     Spencer denied having knowledge of any sexual misconduct on the trip. However, Spencer had explicit knowledge of the misconduct, having been told about it at a minimum.

80.     Spencer further denied that harassment had taken place.

81.     In denying the harassment had taken place, Spencer stated that CPS had only heard one side of the story.

Effects of the Harassment.

82.     The harassment against Plaintiff and isolation from the basketball team continued to escalate after January 31, 2020.

83.     As a result of this harassment, Plaintiff withdrew from Lincoln Park and transferred to another school, De La Salle Institute, for his senior year.

84.     De La Salle Institute does not use a weighted GPA, and as a result of Plaintiff's transfer, his GPA dropped considerably, which impacted his ability to be considered by and apply to elite post-secondary schools.

85.     The lack of coach advocacy for Plaintiff because of his reporting of the harassment severely impacted Plaintiff's ability to receive college basketball scholarships. The retaliatory actions against Plaintiff eliminated his opportunity to receive the exposure to college basketball coaches and recruiters. Further, the lack of "game tape" hindered his ability to provide video to college basketball coaches or recruiters.

86.     Plaintiff made efforts to reach out to the coaches of his college's basketball team, and while the team was impressed, they had hoped for game tape to make a full evaluation of Plaintiff. Plaintiff has not made his college's basketball team.

CPS' Investigation Results

87.     On June 23, 2020, LeMone released a letter to the Lincoln Park High School Community as a status update on the coaches that were removed from their position.

88.     A copy of that letter is attached to Exhibit J to the Complaint.

89.     On February 13, CPS indicated through CCO LaTanya McDade that the information shared on February 3, 2020 in an e-mail to the school community, in which she stated specific allegations against administrators, had been fully substantiated.

90.     A copy of that email is attached as Exhibit K to the Complaint.

91.     In all correspondences, LeMone and McDade indicated that CPS had substantiated multiple allegations of serious misconduct and admitted that such misconduct created significant and severe harm on individuals such as Plaintiff.

92.     Further, given the serious misconduct, in the June 23, 2020, letter, LeMone indicated CPS would be proceeding with a termination hearing against Gordon, and indicated that Robinson and Larry Washington would return to their positions and receive training from the CPS's Administrative Leadership and OSP moving forward.

93.     On February 13, 2020, CPS stated publicly that LPHS leadership minimized sexual misconduct and harassment relating to the Detroit trip.

94.     At some point after February 13, 2020, Brian Thompson, lead Title IX specialist for OSP, informed Plaintiff's father that Plaintiff's claims of harassment against him had been fully substantiated.

## FIRST CLAIM
## AGAINST THE BOARD OF EDUCATION OF THE CITY OF CHICAGO
## TITLE IX RETALIATION

95.     Plaintiff realleges and reincorporates the facts alleged in paragraph 1-94, as if they were set forth here.

96.     Plaintiff engaged in a protected activity under Title IX when he reported the sexual assault to CPS employees directly and through his father.

97.     As a result of reporting the sexual assault, CPS employees and agents retaliated against Plaintiff by taking adverse action against him in one or more of the following ways:

a.      Robinson removed Plaintiff from his role as a starting player on the basketball team and received virtually no playing time for the remainder of the season;

14

b. Gordon, Robinson, and other coaching staff condoned and coordinated the harassment of Plaintiff by their own actions and by other members of the LPHS Boys' Basketball team and LPHS students, as well as the concealment of the sexual misconduct which Plaintiff opposed; and

c. Thuet and Johnson concealed from their superiors/and or otherwise made late reports to their superiors. Moreover, the sexual assault was first reported on or about January 3, 2020, and the retaliation was reported around January 10, 2020, and was received by investigators at latest on January 16, 2020. A proper investigation did not begin until January 30, 2020. Nothing was done within a reasonable time given the seriousness of the situation, and this delay and disregard for the safety of the students involved served to ratify and approve the harassment and retaliation of John Doe by coaching staff and students.

98. The acts of retaliation created significant pressure and emotional trauma on Plaintiff.

99. Furthermore, the loss of playing time and premature end of Lincoln Park's basketball season resulted in significant loss of exposure and damage to the future basketball prospects of Plaintiff.

100. Under these circumstances, and without coach advocacy and their willingness to assist Plaintiff, including the development of "game tape" for Plaintiff to demonstrate his abilities, Plaintiff's college scholarship prospects were significantly diminished.

101. The actions of concealment by the coaching staff and administration, the harassment by other basketball team members and LPHS students resulted in significant mental anguish to Plaintiff. Plaintiff was forced to move to a different school completely and face the trauma of a new year in a new learning and social setting without any friends or familiarity. Along

15

with the unfamiliar environment, Plaintiff's GPA was artificially lowered which impacted his ability to receive both college admissions offers and additional scholarships.

102.    The Board may be held liable for the actions of its employees and agents at CPS.

WHEREFORE, Plaintiff demands judgment in an amount to be established at trial for compensatory damages; plus costs, attorney fees, disbursements and other such relief as this Court deems fair and just.

**SECOND CLAIM**
**AGAINST THE BOARD OF EDUCATION OF THE CITY OF CHICAGO**
**INDEMNIFICATION**

103.    Plaintiff realleges and reincorporates the facts as set forth in Paragraphs 1-94, as if they were set forth here.

104.    At all relevant times, Defendants were employees of CPS acting in their official capacity.

105.    Illinois law, 745 ILCS 10/9-102, provides that the Board of Education of the City of Chicago by way of CPS is directed to pay any tort judgment for compensatory damages entered against its employees acting in their official capacity and/or the scope of their employment.

WHEREFORE, Plaintiff demands judgment in an amount in to be established at trial for compensatory damages;  plus costs, attorney fees, disbursements and other such relief as this Court deems fair and just.

**THIRD CLAIM**
**AGAINST ROJAS, SPRAGGINS,**
**THUET, JOHNSON, LEMONE, MCDADE, PRATT, JACKSON, ROJAS, AND**
**SPRAGGINS**
**WILLFUL AND WANTON**
**CONCEALMENT**

106.    Plaintiff realleges and reincorporates the facts alleged in Paragraphs 1-94, as if they were set forth here.

107.    On January 3, 2020 Thuet was informed of the sexual assault and whistleblower harassment and was presented with credible evidence from parents of the student whistleblowers. However, he ignored Title IX training and protocol and withheld evidence for a substantial amount of time, not less than six days, before notifying OSP and CPS's Title IX leadership.

108.    During this period, Thuet coordinated with Johnson to try and settle the matter without following Title IX requirements. Thuet instructed Johnson to bring the accused and the whistleblowers together in a meeting. Johnson complied with the instruction and held what he called a "peace circle" between the students which jeopardized the safety of the whistleblowers. This was in direct violation of district policy and best practices. Continuing his obfuscation and concealment, Thuet was also not forthcoming with parents of the whistleblowers and misrepresented the seriousness of the allegations.  Mr. Thuet claimed that OSP and CPS's legal counsel had assessed the threats made against their children and determined it was only general in nature and of little concern. At the time Thuet made these representations, neither OSP nor the CPS's legal counsel had been notified by Thuet.

109.    Upon information and belief, Thuet eventually forwarded texts and emails related to harassment against John Doe to his network chiefs and OSP as of January 16, 2020.

110.    OSP and CPS leadership, including Defendants Lemone, McDade, Pratt, Jackson, Spraggins, and Rojas, learned of the retaliation and harassment no later than January 16, 2020.

111.    In spite of this knowledge, OSP did not open an investigation earlier than January 30, 2020, after prompting from John Doe V's father.

112.    By failing to open an investigation into known harassment, CPS demonstrated willful and wanton misconduct, only corrected because of the persistence of John Doe V's father.

17

113.   Their delay resulted in escalating harassment and threats against John Doe, which CPS admitted was imposed upon John Doe, and led eventually to his withdrawal from the school and the City.

114.   As a proximate result of the acts and omissions of Thuet, Johnson, Lemone, McDade, Pratt, Jackson, Spraggins, and Rojas, John Doe suffered significant mental anguish, loss of opportunity related to college scholarships, and pecuniary loss as a result of obtaining education outside CPS.

WHEREFORE, Plaintiff demands judgment in an amount in to be established at trial for compensatory damages; punitive damages, plus costs, disbursements and other such relief as this Court deems fair and just.

**FOURTH CLAIM**
**AGAINST**
**THUET, JOHNSON, LEMONE, MCDADE, PRATT, ROJAS, SPRAGGINS, AND JACKSON**
**WILLFUL AND WANTON**
**FAILURE TO SUPERVISE**

115.   Plaintiff realleges and reincorporates the facts as set forth in Paragraphs 1-94, as if they were set forth here.

116.   Defendants Thuet, Johnson, Lemone, McDade, Pratt, Rojas, Spraggins, and Jackson have responsibilities to ensure that schools like LPHS have and implement proper training and best practices to ensure that student safety is prioritized, that athletic programs be properly supervised and coaches properly vetted, and that when incidents occur proper steps are taken to protect the students. That did not occur here.

117.   Despite knowing of an investigation into sexual assault reported by student whistleblowers, Rojas, Spraggins, Thuet, Johnson, Lemone McDade, Pratt, and Jackson took no action to prevent the leaking of the identities of said whistleblowers.

18

118.     Thuet in fact notified Plaintiff's father that he did not think that OSP would keep the report or any of their identities anonymous.

119.     Upon information and belief, none of the Defendants above took any action to prevent any sort of leaking of John Doe's identity by adult CPS employees.

120.     This situation was volatile and traumatic, as evidenced by the removal of coaches on the trip, yet CPS chose to do nothing to protect the identity of John Doe, who reported the misconduct. CPS knew that the reports were significant in nature yet stated keeping them anonymous would be impossible.

121.     Furthermore, the Defendants did nothing to ensure that those working with the basketball team were properly trained to ensure student safety.  For example, there were no background checks on volunteers for the basketball team. There was no supervision regarding trips to tournaments and the like to ensure that all proper paperwork and approvals were provided. Furthermore, there was a failure to train and supervise personnel to ensure that rather than deny and conceal incidents of sexual misconduct, there would be steps taken to protect victims and work with professionals for assistance with such misconduct where such misconduct would be reported and those reporting such misconduct protected.

122.     Their deliberate inaction was a choice that demonstrated a conscious disregard or deliberate indifference to the safety of John Doe. CPS admitted that the circumstances left the students unprotected and subject to trauma.

123.     Because of their reckless and wanton supervision, environments such as the one LPHS created – where school leadership disregarded Title IX training and protocols, provided lax oversight of the athletic program that fostered a dangerous culture for students, and, as a result, when allegations of sexual misconduct came to light, attempted to minimize the allegations and

withheld key evidence for six days before notifying the Office of Student Protections and Title IX leadership – was allowed to exist and flourish to the determinant of the protection of students such as John Doe.

124.    And the issues impacting the LPHS Boys' Basketball team are not isolated events. Other issues at LPHS and other Chicago Public Schools reveal a system-wide failure to properly supervise, protect, and hold accountable schools and their principals. For example:

a.      There was an incident at LPHS involving the girls basketball and volleyball teams that was left unaddressed which left students unprotected and filled with fear and trauma from continued exposure to situations from the coach;

b.      A teacher who served as the girls cross country coach at Whitney Young High School served for years in that position despite complaints of "creepy" sexual comments and allegations of inappropriate behavior.

125.    As a proximate result of the acts and omission of Rojas, Spraggins, Thuet, Johnson, Lemone, McDade, Pratt, and Jackson, John Doe suffered significant mental anguish, losses of opportunity related to college scholarships, and pecuniary loss as a result of obtaining education outside CPS.

WHEREFORE, Plaintiff demands judgment in an amount in to be established at trial for compensatory damages; punitive damages, plus costs, disbursements and other such relief as this Court deems fair and just.

## FIFTH CLAIM
## AGAINST ROJAS, SPRAGGINS, LEMONE, MCDADE, PRATT AND JACKSON
## WILLFUL AND WANTON
## FAILURE TO PROTECT

126.    Plaintiff realleges and reincorporates the facts alleged in Paragraphs 1-94 as if they were set forth here.

127.    At all relevant times, Defendants were employees of CPS.

128.    Defendants unreasonably delayed the investigation into the harassment John Doe was experiencing and failed to take steps to protect John Doe or otherwise instruct the harassing students to cease all communication with him. Defendants knew of the sexual assault on January 3, 2020, were informed of the whistleblower harassment on January 16, 2020, but failed to conduct a detailed investigation until on or around January 30, 2020.

129.    Additionally, Defendants failed to instruct school administrators and faculty to preserve the anonymity of John Doe. As a result of their failure, faculty revealed the identity of John Doe as a whistleblower to members of the basketball team knowing that such individuals would retaliate against him.

130.    Moreover, because of their reckless and wanton failure to protect, environments such as the one LPHS – where school leadership disregarded Title IX training and protocols, provided lax oversight of the athletic program that fostered a dangerous culture for students, and as a result when allegations of sexual misconduct came to light, attempted to minimize the allegations and withheld key evidence for six days before notifying the Office of Student Protections and Title IX – was allowed to exist and flourish to the determinant of the protection of students such as John Doe.

131.    And the issues impacting the LPHS Boys' Basketball team is not an isolated event. Other issues at LPHS and other schools reveal a system-wide failure to properly supervise, protect, and hold accountable schools and their principals. For example:

c.    There was an incident at LPHS involving the girls basketball and volleyball teams that was left unaddressed which left students unprotected and filled with fear and trauma from continued exposure to situations from the coach;

d.      A teacher who served as the girls cross country coach at Whitney Young High School served for years in that position despite complaints of "creepy" sexual comments and allegations of inappropriate behavior.

132.    As a proximate result of the acts and omission of Rojas, Spraggins, Lemone, McDade, Pratt, and Jackson, John Doe suffered significant mental anguish, losses of opportunity related to college scholarships, and pecuniary loss as a result of obtaining education outside CPS.

WHEREFORE, Plaintiff demands judgment in an amount in to be established at trial for compensatory damages; punitive damages, plus costs, disbursements and other such relief as this Court deems fair and just.

## SIXTH CLAIM
### AGAINST THUET AND JOHNSON
### WILLFUL AND WANTON FAILURE TO PROTECT

133.    Plaintiff realleges and reincorporates the facts alleged in paragraph 1-94, as if they were set forth here.

134.    Thuet was informed of the harassment of John Doe by other LPHS basketball team members and LPHS students and the retaliatory actions taken against him by LPHS basketball coaches, including Gordon and Robinson.

135.    Thuet had actual knowledge of the harassment and threats yet did not follow procedures as required by CPS policy relating to the harassment and bullying.

136.    Per CPS anti-bullying policy, the principal is required to inform OSP of any Title IX related harassment:

> The Principal or his/her designee will provide immediate support to any targeted student(s) to ensure safety. If there are overt or implied risks of safety, follow the steps in the CPS Crisis Manual, including immediately notifying the CPS Student Safety Center and the school's Network office. Alleged behaviors targeted at sex, gender, sexual orientation,

gender identity, or gender expression should be reported immediately to the Office of Student Protections and Title IX for assistance and support at the OSP Hotline: (773) 535-4400.

*See* Exhibit F to the Complaint.

137. CPS has admitted the reckless and wanton conduct of Thuet and his hand in "foster[ing] a dangerous culture for students,"  The reckless and wanton conduct was described and admitted by CPS who themselves have relied upon the following statements and others in defending against a defamation action brought by Thuet:

> After learning about the serious allegations involving the boys basketball team, Mr. Thuet attempted to minimize the allegations and failed to protect the survivor and student whistleblowers, and either condoned or did not intervene when a campaign of retaliation occurred against the survivor and the students who they believed brought the allegation to light.  When Mr. Thuet became aware of the allegations, including being presented credible evidence from parents of the student whistle blowers, he ignored Title IX training and protocol and withheld evidence for six days before notifying the office of Student Protections and Title IX.

> In the intervening six days, Mr. Thuet instructed Dean John Johnson to bring the accused and the whistleblowers together in a meeting. Johnson complied with the instruction and held what he called a "peace circle" between the students which jeopardized the safety of the whistleblowers.   This was in direct violation of district policy and best practices.  Mr. Thuet was also not forthcoming with parents of the whistleblowers and misrepresented the seriousness of the allegations.  Mr. Thuet claimed that OSP and the Law office had assessed the threats made against their children and determined it was only general in nature and of little concern.  At the time, neither OSP nor the Law Department had been notified by Mr. Thuet. Despite their parents' best efforts to protect their children, the whistleblowers continued to be threated and harassed because they chose to come forward with the allegations.
> See Docket No. 116-17 at pages 2-3 in Case No. 20 CV 01369.

138. As seen by CPS's own admissions, Thuet either failed to report the information he had and/or intentionally downplayed the retaliation and harassment and omitted details when reporting to OSP and his supervisors.

139. For his part, Johnson – despite being well aware of the impropriety of actions such as the peace circle – directly violated district policy and best practices by holding an open "peace

circle" between John Doe and his harassers and placing them in the same room at Thuet's instruction. His actions revealed John Doe's identity to his harassers and placed him in immediate threat of physical harm.

140.     Thuet and Johnson also failed to intervene in the increasingly toxic environment of the basketball team, which included physical threats, harassment, and retaliation from students and coaches, and leaking of the identities of John Doe and others.

141.     Thuet was motivated to protect the LPHS basketball team because of its great success.

142.     Defendants Thuet and Johnson's coordinated actions described above constitutes wanton and willful misconduct, as they showed an utter disregard for the safety of John Doe.

143.     As a result, no action was taken to support or protect John Doe, nor was there any substantial investigation into the harassment until parents escalated the complaints on   January 29, 2020.

144.     Due to this delay, the harassment and retaliation continued until the season was forced to be cancelled and resulted in a toxic environment that destroyed the school year for John Doe and forced him to leave the school entirely at the end of school year.

145.     As a proximate result of Thuet and Johnson's actions, John Doe suffered significant mental anguish, loss of opportunity related to college scholarships, and pecuniary loss as a result of obtaining education outside CPS.

WHEREFORE, Plaintiff demands judgment in an amount in to be established at trial for compensatory damages; punitive damages, plus costs, attorney fees, disbursements and other such relief as this Court deems fair and just.

**SEVENTH CLAIM**
**AGAINST GORDON AND ROBINSON**
**WILLFUL AND WANTON**
**FAILURE TO PROTECT**

146.    Plaintiff realleges and reincorporates the facts alleged in Paragraphs 1-94, as if they were set forth here.

147.    At all relevant times, Gordon and Robinson were employees of CPS.

148.    Gordon leaked the identity of John Doe as a whistleblower to Robinson knowing that Robinson would share that information with the team and that team members would retaliate against John Doe. Robinson then revealed the identity of John Doe as a whistleblower to members of the basketball team knowing that such individuals would retaliate against him.

149.    Further, Gordon gave direction to Robinson to retaliate against John Doe by, among other means, eliminating his playing time.  Robinson complied, retaliating against John Doe by, among other means, eliminating his playing time.

150.    Gordon and Robinson coordinated retaliation against John Doe, and their overall indifference to taking the students on an unauthorized trip to Detroit, demonstrated an utter disregard or deliberate indifference to John Doe's safety.

151.    As a proximate result of Gordon and Robinson's actions, John Doe suffered significant mental anguish, loss of opportunity related to college scholarships, and pecuniary loss as a result of obtaining education outside CPS.

WHEREFORE, Plaintiff demands judgment in an amount in to be established at trial for compensatory damages; punitive damages, plus costs, disbursements and other such relief as this Court deems fair and just.

**EIGTH CLAIM**
**AGAINST THUET, JOHNSON, GORDON AND ROBINSON**

25

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

152. Plaintiff realleges and reincorporates the facts alleged in Paragraphs 1-94, as if they were set forth here.

153. At all relevant times, Thuet, Johnson, Gordon, and Robinson were employees of CPS.

154. Gordon leaked the identity of John Doe as a whistleblower to Robinson knowing that Robinson would share that information with the team and that team members would retaliate against John Doe. Robinson then revealed the identity of John Doe as a whistleblower to members of the basketball team knowing that such individuals would retaliate against him.

155. To compound the distress, Gordon gave direction to Robinson to retaliate against John Doe by, among other means, eliminating his playing time. Robinson complied, and retaliated against John Doe by, among other means, eliminating his playing time.

156. On January 3, 2020, Thuet was informed of the sexual assault and whistleblower harassment and was presented with credible evidence from parents of the student whistleblowers, however, he ignored Title IX training and protocol and withheld evidence of harassment of whistleblowers for a period of not less than six days.

157. During that period, Thuet coordinated with Johnson to try and settle the matter without following Title IX requirements. Thuet instructed Johnson to bring the accused and the whistleblowers together in a meeting, knowing that this would cause severe emotional distress to John Doe. Johnson complied with the instruction and held what he called a "peace circle" between the students which jeopardized the safety of the whistleblowers. This was in direct violation of district policy and best practices. Continuing his obfuscation and concealment, Thuet was also not forthcoming with parents of the whistleblowers and misrepresented the seriousness of the

allegations. Mr. Thuet claimed that OSP and CPS's legal counsel had assessed the threats made against their children and determined it was only general in nature and of little concern. At the time Thuet made these representations, neither OSP nor CPS's legal counsel had been notified by Thuet.

158.    Thuet and Johnson's coordinated actions were meant to obfuscate the issues and make John Doe feel helpless enough to drop the allegations and pursuit of an official investigation.

159.    Defendants' coordinated retaliation against John Doe was extreme, dangerous, and calculated to cause John Doe severe emotional distress.

160.    As a proximate result of Defendants' actions, John Doe suffered significant mental anguish, loss of opportunity related to college scholarships, and pecuniary loss as a result of obtaining education outside CPS.

## **JURY DEMAND**

Plaintiff demands a trial by jury for all claims for which a trial by jury would be available. Fed. R. Civ. P. 38.

Dated: May 25, 2022

Respectfully Submitted,

*/s/ Thomas G. Gardiner*
Attorneys for Plaintiff

Thomas G. Gardiner (Ill. Bar 6180243)
Hamza Jaka
Gardiner Koch Weisberg & Wrona
53 West Jackson Blvd., Suite 950
Chicago, Illinois 60604
P 312-362-0000
F 312-362-0440
tgardiner@gkwwlaw.com
hjaka@gkwwlaw.com

Michael Rachlis
RACHLIS DUFF & PEEL, LLC
542 South Dearborn, Suite 900
Chicago, Illinois 60605
P. 312-733-3950
F. 312-733-3952
mrachlis@rdaplaw.net





EXHIBIT

A

█████████████

| | |
|---|---|
| **From:** | Thuet, John <jrthuet@cps.edu> |
| **Sent:** | Tuesday, December 31, 2019 2:38 PM |
| **To:** | ████████ |
| **Cc:** | █████████████ |
| **Subject:** | Re: Meeting Request |
| **Attachments:** | image003.png |

**EXHIBIT**

tabbies

B

Hello ████ and████

I would be happy to meet with you as soon as possible. Please let me know of your availability on Thursday morning. Thank you.

John Thuet
Interim Principal
Lincoln Park High School

On Tue, Dec 31, 2019, 1:43 PM ████████████████████████████ wrote:

> Mr. Thuet,
>
>
> I hope you are enjoying the holiday season. I'm the father of████████, a junior at Lincoln Park High School. I, along with████████ (copied here), would like to meet with at earliest convenience regarding a very serious matter. Mr.████ is the father of████████ also a junior at Lincoln Park.
>
>
> Please let us know you availability as soon as possible.
>
>
> Thanks.
>
>
> ████████
>
>
> ████████
>
> ████████
>
> ████████████
>
> ████████

1

███████████████

**From:** Thuet, John <jrthuet@cps.edu>
**Sent:** Friday, January 3, 2020 8:40 AM
**To:** ███████████
**Cc:**
**Subject:** Re: Meeting Request

Just to update you both, I completed my report to OSP, so the investigation is now in their hands. While I kept your report anonymous, they did say that they are unsure if this will be possible and may need to follow up with you, so I will let you know if I hear anything else. I am also in the process of working with CPS on the adult issues involved. I doubt that I will be able to share specifics beyond that, but I want to assure you that we are taking appropriate steps. Thanks,

**John Thuet**
Interim Principal, Lincoln Park High School
2001 N Orchard St, Chicago, IL 60614
773.534.8130 Main | 773.534.8218 Fax
lincolnparkhs.org



On Thu, Jan 2, 2020 at 9:35 AM ████████████████████████████████ wrote:
  No worries. We are here.


        On Jan 2, 2020, at 9:30 AM, Thuet, John <jrthuet@cps.edu> wrote:

        I went to the wrong Starbucks. I'll be a few minutes late.

        John Thuet
        Interim Principal
        Lincoln Park High School



On Dec 31, 2019, at 2:38 PM, Thuet, John <jrthuet@cps.edu> wrote:

Hello ███ and ███

I would be happy to meet with you as soon as possible. Please let me know of your availability on Thursday morning. Thank you.

John Thuet
Interim Principal
Lincoln Park High School

On Tue, Dec 31, 2019, 1:43 PM ███████████
███████████████████████████ wrote:

Mr. Thuet,


I hope you are enjoying the holiday season. I'm the father of ███████████, a junior at Lincoln Park High School. I, along with ███████ (copied here), would like to meet with at earliest convenience regarding a very serious matter. Mr. ████ is the father of ██████████ also a junior at Lincoln Park.


Please let us know you availability as soon as possible.


Thanks.


████████


████████


████████


███████████████████


██████████████


████████





**LINCOLN PARK HIGH SCHOOL**
2001 N. Orchard St.
Chicago, IL 60614
P: 773-534-8130
F: 773-534-8218

WWW.LINCOLNPARKHS.ORG

**John Thuet**
*Interim Principal*

**Elizabeth Brown**
*Assistant Principal*

**Kenneth Duncan**
*Assistant Principal*

**Michelle Brumfield**
*Assistant Principal*

Dear Lincoln Park High School Boys Basketball Team Parents and Families,

The safety of your children is always our top priority, which is why I must inform you of a situation that has recently come to light. I've been made aware that members of the boys basketball team took an overnight trip over winter break that was not a school sponsored event. The staff member who led the trip has been removed from the school, and the district is investigating this situation in accordance with CPS policy.

Please know that we are taking this situation seriously, and we remain committed to providing your children with a safe, positive learning environment where they can reach their full potential. While I am unable to discuss details regarding the investigation, I am always available to discuss steps the district takes to keep students safe and matters related to your child. I can be reached at (773) 534-8130 or jrthuet@cps.edu.

Sincerely,
Principal Thuet



**EXHIBIT**

D





**To:** Monday, January 13, 2020 5:32 PM
Thuet, John;
**Subject:** RE: Basketball Team Update 1-9
**Attachments:** Lincoln P.jpg

John,

I'm writing to inform you that Pat Gordon is still communicating with the team via text messages. He's also communicating with the parents as well. It's my understanding that he has been removed as the coach, but it is clear that he is still very much coaching and calling the shots. See the attached text message.

Also, there are cameras in the hotel hallways and lobby.

Please let me know if you'd like to discuss.



**From:** Thuet, John <jrthuet@cps.edu>
**Sent:** Thursday, January 9, 2020 1:31 PM
**To:**
**Subject:** Fwd: Basketball Team Update 1-9

Hi ▇▇ and ▇▇,

I don't believe your emails were on my original list. This was sent to basketball families earlier today. I hope it helps. Thanks,

**John Thuet**
Interim Principal, Lincoln Park High School
2001 N Orchard St, Chicago, IL 60614
773.534.8130 Main | 773.534.8218 Fax
lincolnparkhs.org

---------- Forwarded message ---------
From: **Thuet, John** <jrthuet@cps.edu>
Date: Thu, Jan 9, 2020 at 12:22 PM
Subject: Basketball Team Update 1-9
To: John Thuet <jrthuet@cps.edu>

Hello Basketball Families,

Please review the attached letter about the coaching change that occurred yesterday.

For the immediate time, Donavan Robinson who has helped out with the program in the past and is a long time CPS employee will take over as interim head coach.

Thanks,


**John Thuet**
Interim Principal, Lincoln Park High School
2001 N Orchard St, Chicago, IL 60614
773.534.8130 Main | 773.534.8218 Fax
lincolnparkhs.org



by the weightroom business as usual, captains I need you to stepup and lead Stretch and Core

**Friday** 3:27 PM

Lincoln Park Varsi: You guys will meet Coach Robinson @ 430 in room 206

Good Luck tonight stay locked in

Beat Down The Indians
-
Text back to reply

**Today** 2:57 PM

Lincoln Park Varsi: Good Afternoon, though the hearing went well this morning, no decision will be made til tomorrow,

You will meet Coach Ott by the weightroom

Text Message

          



# Chicago Public Schools Policy Manual

| | |
|---|---|
| **Title:** | **ANTI-BULLYING** |
| **Section:** | **705.5A** |
| **Board Report:** | 19-0626-PO4 |

**Date Adopted: June 26, 2019**

**Policy:**

## ANTI-BULLYING POLICY

### Purpose

The Illinois General Assembly has found that a safe and civil school environment is necessary for students to learn and achieve and that bullying causes physical, psychological, and emotional harm to students and interferes with their ability to learn and participate in school activities. Bullying has been linked to other forms of antisocial behavior, such as vandalism, shoplifting, skipping and dropping out of school, fighting, using drugs and alcohol, sexual harassment, and violence. It is the goal of the Chicago Board of Education ("Board") to create a learning environment in all its school communities where all students feel safe and supported, are protected from bullying, and are able to succeed academically and develop socially and emotionally into responsible, caring individuals.

The Board asks every Chicago Public School ("CPS") student, with the support of his/her parent(s), guardian(s) and the adults at school, to commit to the following principles, which will apply to everyone on school property and at school-related activities:

- I will not bully others.
- I will try to help anyone I suspect is being bullied.
- I will work to include students who are left out.
- If someone is being bullied, I will tell an adult at school and an adult at home.

### Scope

Bullying is contrary to Illinois law and this Policy is consistent with the Illinois School Code. This Policy protects CPS students against bullying and harassment on the basis of actual or perceived race or ethnicity, color, religion, sex, national origin or immigration status, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, gender or sex (includes gender identity, gender expression, pregnancy, childbirth, breastfeeding, and pregnancy related medical conditions), genetic information, unfavorable discharge from military service, political belief or affiliation, or on the basis of a person's association with a person or group with one or more of the aforementioned actual or perceived characteristics, or any other distinguishing characteristic. The Board recognizes the particular vulnerability of students with actual or perceived disabilities and those who identify as or are perceived to be lesbian, gay, bisexual or transgender. Nothing in this Policy is intended to infringe upon any expression protected by the First Amendment to the United States Constitution or Section 3 of Article I of the Illinois Constitution.

This Policy is based on the engagement of a range of school stakeholders, including students and parents/guardians. The Board or its designee will re-evaluate this Policy every two (2) years based on an assessment of its outcomes and effectiveness, including, but not limited to, factors such as the frequency of victimization; student, staff and family observations of safety at school; identification of areas of a school where bullying occurs; the types of bullying utilized; and bystander intervention or participation. The information developed will be made available on the District's website.

Bullying and harassment are prohibited:

(1) during any school-sponsored or school-sanctioned program or activity;

(2) in school, on school property, on school buses or other Board-provided transportation, and at designated locations for students to wait for buses and other Board-provided transportation ("bus stops");

(3) through the transmission of information from a CPS computer or computer network, or other electronic school equipment;

22

(4) when communicated through any electronic technology or personal electronic device while on school property, on school buses or other Board-provided transportation, at bus stops, and at school-sponsored or school-sanctioned events or activities;

(5) when it is conveyed that a threat will be carried out in a school setting, including threats made outside school hours with intent to carry them out during any school-related or sponsored program or activity or on Board-provided transportation;

(6) when it is a Student Code of Conduct ("SCC") Group 5 or 6 behavior that occurs off campus but most seriously disrupts any student's education.

### Definitions

**"Bullying"** means any physical or verbal act or conduct, including communications made in writing or electronically, directed toward a student or students, and meets all of the following criteria:

(1) An observed or perceived imbalance of power exists between the person(s) engaging in the bullying behavior(s) and the targeted student(s); and/or student(s) were targeted based on prejudice or bias (as defined below).

(2) The behaviors are severe or pervasive (repeated over time), or there is a high likelihood that behaviors will be repeated. While bullying is often characterized by repeated acts, sometimes a single incident constitutes bullying depending on the severity and if other elements of bullying are present.

(3) The intent of the person(s) engaging in the behavior is to cause physical or emotional harm to the targeted student(s).

(4) The behavior has or can be reasonably predicted to have one or more of the following effects:
(a) placing the student in reasonable fear of harm to the student's person or property;
(b) causing a substantially detrimental effect on the student's physical or mental health;
(c) substantially interfering with the student's academic performance; or
(d) substantially interfering with the student's ability to participate in or benefit from the services, activities, or privileges provided by a school.

Bullying may take various forms, including without limitation, one or more of the following: harassment, threats, intimidation, stalking, physical violence, sexual harassment, sexual violence, theft, public humiliation, destruction of property, or retaliation for asserting or alleging an act of bullying. This list is meant to be illustrative and non-exhaustive.

"**Cyberbullying**" means using information and communication technologies to bully. This definition includes cyberbullying by means of technology that is not owned, leased, or used by the school district when an administrator or teacher receives a report that bullying through this means has occurred. This Policy does not require a district or school to staff or monitor any nonschool-related activity, function, or program.

**"Retaliation"** means any form of intimidation, reprisal including but not limited to the submission of knowingly false bullying allegations, or harassment directed against a student who reports bullying, provides information during an investigation, or witnesses or has reliable information about bullying. Retaliation is prohibited and will result in the imposition of appropriate interventions/consequences according to this Policy and the SCC.

**"Peer Conflict"** means disagreements and oppositional interactions that are situational, immediate and developmentally appropriate. Conflicts arise when two or more students with relatively similar observed or perceived power have differences in opinion or perspectives. When school employees are aware of peer conflict, they are expected to guide students in developing new skills in social competency, learning personal boundaries and peaceably resolving conflict, and to model appropriate social interactions.

**"Prejudice or bias"** means motivation for bullying or harassment based in part or in whole by actual or perceived race, color, religion, sex, national origin or immigration status, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, gender-related identity or expression, unfavorable discharge from military service, association with a person or group with one or more of the aforementioned actual or perceived characteristics, or any other distinguishing characteristic.

23

**"Restorative Practices"** means a continuum of school-based alternatives to exclusionary discipline that are adapted to the particular needs of the school and community, contribute to maintaining school safety, protect the integrity of a positive and productive learning climate, teach students the personal and interpersonal skills they will need to be successful in school and society, serve to build and restore relationships among students, families, schools, and communities, and reduce the likelihood of future disruption by balancing accountability with an understanding of students' behavioral health needs. Restorative practices are ways of pro-actively developing relationships and community, as well as repairing community when harm is done. After conflict or harm, Restorative Practices provide a way of thinking about, talking about, and responding to issues and problems by involving all participants to discuss their feelings and opinions, identify what happened, describe how it affected everyone, and find solutions to make things better.

## Preventing Bullying
All CPS principals and staff shall work to develop safe, supportive school environments that prevent bullying through:
- **Developing supportive school climate strategies**, including clear expectations and share agreements to guide interactions between students, and between staff and students.
- **Teaching all students social and emotional skills** and establish classroom and school-wide practices that promote relationship-building, including teaching all school stakeholders to speak out when they see or hear bullying, degrading language, and bias or prejudice.
- Establish predictable responses and **effective disciplinary practices** that address root cause, teach skills, build empathy, and repair harm. Ensure all students, staff, and stakeholders know how your school plan to respond to bullying and harassment.

**Intervening to Address Bullying**
A. Responsibilities of CPS Employees and Contractors
All CPS employees and contractors, including security officers, lunchroom staff and bus drivers, who witness incidents of bullying or school violence or who possess reliable information that would lead a reasonable person to suspect that a person is a target of bullying, must:
(1) intervene immediately in a manner that is appropriate to the context and ensures the safety of all people involved;
(2) report the incident of bullying or retaliation to the Principal/Designee as soon as practicable, but within 24 hours, on the CPS Bullying Complaint Form (Attachment A); and
(3) cooperate fully in any investigation of the incident and in implementing any safety plan established by the Principal/Designee.

B. Responsibilities of Students, Parents and Guardians
No student who witnesses bullying may stand by or participate in the bullying, but must notify an adult at school and an adult at home as quickly as practicable. Any parent or guardian who witnesses or is notified of bullying has an obligation to advise the Principal/Designee as quickly as practicable. Reports can be made to any CPS employee or contractor in person, by completing Attachment A and submitting it to the Principal/Designee, by calling the CPS Parent Support Center at (773) 553-3772, or by emailing BullyingReport@cps.edu. Anonymous reports will be accepted by the Principal/Designee. No disciplinary action will be taken on the sole basis of an anonymous report.

C. Steps for Investigating Bullying Reports
(1) **Ensure safety.** The Principal or his/her designee will provide immediate support to any targeted student(s) to ensure safety. If there are overt or implied risks of safety, follow the steps in the CPS Crisis Manual, including immediately notifying the CPS Student Safety Center and the school's Network office. Alleged behaviors targeted at sex, gender, sexual orientation, gender identity, or gender expression should be reported immediately to the Office of Student Protections and Title IX for assistance and support at the OSP Hotline: (773) 535-4400.

(2) **Notify parents/guardians of all involved students.**  Within one school day of receipt of a bullying report, the Principal/Designee shall report to the parent/legal guardian of all involved students, via telephone, personal conference and/or in writing, the occurrence of any alleged incident of bullying, and shall document these notifications in the District student information system.
   a.  Notifications should be made privately to students directly involved and their parent/legal guardians.
   b.  Additionally, when incidents have a larger impact on the school community, the Principal/Designee shall provide clear communication to students, staff and parents to re-inforce school-wide expectations and a climate of respect and inclusion.

(3) **Document all allegations of bullying**.  Within two school days of receiving a report of bullying, the Principal/Designee will document the allegation in the District student information system as a general incident report and document all notifications made.

(4) **Conduct an investigation.**  The Principal and/or a designee, who is knowledgeable about bullying prevention and intervention, shall perform the investigation.  For guidance, contact the Law Department at (773)553-1700.

   Investigation of reported bullying shall be initiated within 5 school days of receipt of a report, documented within the incident report in the District student information system, and completed within 10 school days, unless the Principal grants in writing an additional 5-day extension due to extenuating circumstances. The Principal/Designee shall document the extension in the investigation report and shall notify the parties involved.

   The investigation shall include:
   a.  Identifying all involved parties, including the student(s) alleged to have engaged in the bullying behaviors, alleged target(s) and bystander(s), as well as any adult who witnessed the incident or may have reliable information about it.
   b.  Conducting an individual interview in a private setting with all involved parties.  The alleged target should never be interviewed in public or with the student(s) alleged to have engaged in bullying.
   c.  Determining how often the conduct occurred, any past incident or continuing pattern of behavior, and the District student information system of the behaviors on the targeted student's education.
   d.  Assessing the individual and school-wide effects of the incident relating to safety.

(5) **Make a determination whether allegations of bullying are substantiated or not and document determination.** The Principal/Designee shall consider whether the four elements of the bullying definition are met, or if all four elements of bullying are not present, whether the behavior qualifies as another inappropriate behavior listed in the SCC.  When the investigation is complete, the Principal/Designee shall ensure the investigation and findings (whether the report of bullying is substantiated or not substantiated) are documented in the District student information system.  If the investigation determines a student engaged in bullying behaviors and/or other inappropriate behaviors listed in the SCC, the Principal/Designee shall prepare a Misconduct Report.

(6) **Notify all involved parties of the outcome of the investigation.** Within one day of making a determination, the Principal/Designee shall notify, in writing, the parents/legal guardians of all students involved of the outcome of the investigation.  Parents/legal guardians of the students who are parties to the investigation may request a personal conference with the Principal/Designee to discuss the investigation, the findings of the investigation, the actions taken to address the reported incident of bullying, and any resources available in or outside the school to help the students address the underlying reasons for the bullying.

   When communicating incidents of bullying to the targeted student's parent/guardian, the Principal/Designee should consider whether the student may want to keep certain information confidential.  For example, if a student is bullied after coming out as gay, the Principal/Designee shall not disclose the student's sexual orientation to the parent/guardian without the student's permission, unless there is a legitimate, school-related reason for doing so.

25

If the investigation determines a student engaged in bullying behaviors, the Principal/Designee shall provide the Misconduct Report to the parent/legal guardians of the student who engaged in the behaviors. The Principal/Designee may advise the parent/legal guardian of other involved students that the Student Code of Conduct was followed. S/he may not advise them of specific consequences imposed, as that would violate the confidentiality of school-record information required by law.

D. Determining an Appropriate Response

The goal of the response is to ensure the targeted student feels safe and welcome, and the student engaging in bullying behaviors understands the harm s/he caused and changes his/her behavior. For guidance in determining an appropriate response, contact the Office of Social & Emotional Learning at (773) 553-1830, or see cps.edu/SEL.

(1) **Identify school risk factors and ensure a universal strategy for school climate improvement and social and emotional development.** Assess and address any issues in supervision, expectations, relationship-building, and emotional learning.

(2) **Support the targeted student.** Assign school staff to create and implement a plan that will restore a sense of safety for the targeted student and other students who have been impacted. Determine any other interventions that may be appropriate.

If the targeted student has a disability, the school shall convene the IEP Team to determine whether additional or different special education or related services are needed to address the student's individual needs and revise the IEP accordingly. For example, if the student's disability affects social skill development or makes the student vulnerable to bullying, the Principal/Designee shall ask the student's IEP Team to consider whether the IEP should include provisions to reduce vulnerability to bullying.

(3) **Determine interventions and/or consequences that address the root cause of the students' bullying behaviors.** Consider the nature of the behavior, the developmental age of the student, and the student's history of problem behaviors and performance. Follow the Student Code of Conduct and the *Guidelines for Effective Discipline*, and identify opportunities to teach, build empathy, and repair harm. While suspensions may be necessary in some cases to ensure the safety of the targeted student, keep in mind that suspending or expelling students who bully does not reduce bullying behavior.

If the student who engaged in bullying behavior is a student with a disability, the school shall convene the IEP Team to determine if additional supports and services are needed to address the inappropriate behavior and develop the student's social and emotional skills. The team may also consider examining the environment in which the bullying occurred to determine if changes to the environment are warranted. For example, the IEP Team should consider a behavior intervention plan for the student or review a current behavior intervention plan and revise if necessary. The Principal/Designee shall comply with the Procedural Safeguards for Discipline of Students with Disabilities/Impairments when considering interventions and consequences for students with disabilities.

Contact the Office of Social & Emotional Learning for school-wide climate and skill-building practices that prevent bullying, and the CPS Law Department for more information about the appropriate and legal consequences for student misconduct.

(4) **For incidents that impact the larger school community, provide opportunities in safe, structured environments for affected students, staff, and/or parents to speak about the incident, its impact, and what is needed to repair the harm.**

E. What Not To Do:

- Solicit an apology from the student who engaged in bullying to the targeted student or mandate a public apology, use peace circles, victim/offender conferences, or any form of mediation that puts the student who engaged in bullying in contact with the targeted student in an immediate attempt to resolve the

26

bullying. Restorative measures may be helpful to repair relationships between the student who engaged in bullying and targeted student, but only if used after other interventions have balanced the power differential between the perpetrator and target.

- Dismiss bullying as typical student behavior or assume it is not serious.

## Appeal

Any party who is not satisfied with the outcome of the investigation may appeal to the Office of Student Protections and Title IX, or OSP (telephone: 773 535-4400), within 15 calendar days of notification of the Principal's decision. OSP shall render a final determination in accordance with the timeline and procedures set out in the anti-bullying appeal guidelines established by OSP. OSP may return the incident to the Network Chief, Principal or their designees for further investigation or reconsideration of the consequence(s), direct the imposition of other consequence(s), or deny the appeal. OSP shall notify the party requesting the appeal and the Principal that its decision is final and shall document that notification in the Incident Report in the District student information system.

## Consequences for CPS Employees and Contractors

When it is determined that an employee or contractor was aware that bullying was taking place but failed to report it, the employee/contractor will be considered to have violated this Policy. The Principal shall consider employee discipline for such violations, making reference to any applicable collective bargaining agreement. Remedies for offending contractors should be imposed according to their Board contracts.

## Notice and Dissemination of Requirements

Principals shall follow the requirements established by the Office of Social & Emotional Learning for posting this Anti-Bullying Policy on the school's website, in the school building as well as disseminating and presenting this Policy to school staff as part of pre-school-year professional development.

## Training and Professional Development

Staff

Professional development will be offered to build the skills of all CPS employees, contractors and volunteers to implement this Policy. The content of such professional development shall include, but not be limited to:

(1) Developmentally appropriate strategies to prevent incidents of bullying and to intervene immediately and effectively to stop them;

(2) Information about the complex interaction and power differential that can take place between and among a perpetrator, target, and witness to the bullying;

(3) Research findings on bullying, including information about specific categories of students who have been shown to be particularly at risk, and any specific interventions that may be particularly effective for addressing bias-based bullying; and

(4) Information about Internet safety issues as they relate to cyberbullying.

Student Internet Safety Education

In accordance with the Board's Internet Safety Policy (http://policy.cps.edu/download.aspx?ID=261), each school shall incorporate into the school curriculum a component on Internet safety to be taught at least once each school year to all students. The Chief Officer of Teaching and Learning or designee, shall determine the scope and duration of this unit of instruction and topics covered. At a minimum, the unit of instruction shall address: (a) safety on the Internet; (b) appropriate behavior while online, on social networking Web sites, and in chat rooms; and (c) cyberbullying awareness and response. The age-appropriate unit of instruction may be incorporated into the current courses of study regularly taught. Schools shall satisfy the documentation requirements established by the Chief Officer of Teaching and Learning or designee to ensure compliance with this curricular requirement.

**ATTACHMENT A**
Chicago Public Schools
Form for Reporting Bullying and Retaliation

NOTE:  The reporter may remain anonymous, but no discipline will be imposed based solely upon an anonymous report.

Please submit this report to the principal or any school staff member.  You may also call the Parent Support Center (773 553-3772) or email BullyingReport@cps.edu to make a report.

**Victim or Target Information**

School: _____

Name(s) and grade(s) of Victim/Target:
_____

_____

**Reporting Information (*Optional for students/parents/guardians)**

Name & Title of Person Reporting: _____

Relationship to Victim/Target: _____

Phone: _____     Email Address: _____

**Incident Information**

Name(s) of student(s) accused of engaging in bullying behaviors OR description (if name(s) unknown):
_____

Location of incident: _____

Date and time of incident: _____

Approximate dates, times, and frequency of prior incident(s):_____

Describe what happened and who was present in as much detail as possible (*Required Information):

_____

_____

_____

_____

Date of submission: _____

**Amends/Rescinds:**
**Cross References:**    19-0626-PO4 (Student Code of Conduct Effective September 3, 2019)
18-0725-PO1 (Student Code of Conduct Effective September 4, 2018)
17-0628-PO1 (Student Code of Conduct Effective September 5, 2017)
15-0722-PO1 (Student Code of Conduct Effective September 8, 2017)
14-0625-PO1 (Student Code of Conduct Effective September 2, 2014)
13-0724-PO2 (Student Code of Conduct for the 2013-2014 School Year)
12-0627-PO1 (Student Code of Conduct for the 2012-2013 School Year)

**Legal References:**

███████████

| | |
|---|---|
| **From:** | ███████████ |
| **Sent:** | Tuesday, January 21, 2020 11:51 AM |
| **To:** | Thuet, John |
| **Cc:** | tmccoy10@cps.com; ███████ |
| **Subject:** | Follow Up To Friday's Call |
| **Attachments:** | IMG_3521.PNG; IMG_3518.PNG; IMG_3522.PNG; IMG_3519.PNG |

**EXHIBIT**

**G**

John,

Thanks for the call on Friday with me and ███████ . Per our discussion, I wanted to follow up regarding the current members of the coaching staff for the boys varsity basketball team at Lincoln Park. Can you please provide the names of those individuals? Further, attached are several concerning text messages. I believe you received these text messages from ███████, ███ 's father, sometime ago. Below is a description of the text messages:

1. IMG_3521 - A text exchange between ███████████ In this text, ███ tells ███ that ███ and ███ told their parents what happened and she's not mad at him about it.
2. IMG_3518 and IMG_3522 – Threatening text exchanges between ████ to ███ on the team group chat.
3. IMG_3519 – A threatening social media exchange between ███ 's adult brother, ███████████, to

Also as discussed Friday, ████ is seriously considering transferring ███ out of the school as a result of the threats, retaliation and overall toxic environment at Lincoln Park. It is my understanding that Donavan Robinson, the interim head coach, is the one that told the coaching staff and team that it was ████ that did the right thing and told his parents. Donovan told ████ as much. The retaliation against ███ and ███ is continuing. ████ went from a starter all season to receiving no playing time at all.

From our conversations, I understand you are unable to do anything further about this situation. As a result, I will be reaching out to others at CPS and IHSA regarding this issue.

Thanks.

███████

███████████████████





**EXHIBIT**

H

**From:** Williams, Aneita <amwilliams65@cps.edu>
**Sent:** Wednesday, January 22, 2020 12:23 PM
**To:**
**Cc:** Rodriguez, Aimee <arodriguez651@cps.edu>; Debra Spraggins <dspraggins7@cps.edu>
**Subject:** Re: Title IX Violation to Original Complaint

Good afternoon Mr.          ,

Thank you for notifying me of the situation. This email acknowledges that the Office of Student Protections and Title IX (OSP) received your **complaint of retaliation against student athletes on the Lincoln Park Boys Basketball team**.

Our office takes these matters seriously and will look into the issue you identified in your email. The signature line of your email includes office contact information, however would you like to provide an additional phone number (cell or home) where you can be reached? We will be contacting you to discuss the issue in further detail prior to our investigation.

I am copying my manager, Aimee Rodriguez, Director of Title IX Compliance & Training and Debra Spraggins, Director of Investigations on this communication. If you have any questions or concerns in the meantime, feel free to reach out to me directly. My contact information is below. You may also contact Aimee at arodriguez651@cps.edu, (773) 535-4528.

Thank you for your cooperation.

On Tue, Jan 21, 2020 at 3:33 PM                                          wrote:

> Aneita,
>
> I'm writing to inform you there has been retaliation against a couple of students-athletes on the Lincoln Park Basketball team regarding the incident that occurred on the unauthorized trip to Detroit. There have been threatening texting messages between the students. In addition, there have been text messages between some students and adult siblings of students involved.
>
> Please let me know if you'd like additional information.
>
> Thanks.



--
**Aneita Williams | Title IX Sports Compliance Coordinator**
**Office of Student Protections & Title IX**
**Chicago Public Schools | Near West Office**
**110 N. Paulina Street**
**Chicago, IL 60612**
**Direct: (773) 535-4402, ext. 54402 | Office: (773) 535-4400**
amwilliams65@cps.edu
OSP Website | https://cps.edu/Pages/NonDiscrimination.aspx

https://www.credential.net/eecf5220-9994-4303-b018-cc6ee59af418

*Confidential – This document and the attachments hereto contain confidential work product and/or preliminary drafts, notes, recommendations, memoranda and other records in which opinions are expressed, or policies, observations, recommendations, actions are formulated and is intended for internal use, analysis, decision making, and administrative action only. The contents of this document and its attachments should not be disseminated without prior approval from the Chicago Public Schools.*





**From:** Thompson, Brian <bkthompson2@cps.edu>
**Sent:** Thursday, January 30, 2020 3:47 PM
**To:** ███████████████ ██████████
**Subject:** Meeting Follow Up

Mr. ██████ and Mr. ██████,

Thank you for taking the time to meet with us this afternoon. We know that whenever parents are coming to meet with us the conversations are not easy to have. We appreciate the two of you coming in to have the conversation and advocating for your children. Our office has been charged with addressing all allegations of sexual misconduct, which includes retaliation after making a report. We have opened an investigation into the allegations you've brought forward, which is being recorded under OSP 19/20-01625. The official complaint received notification is attached to this correspondence.

Most importantly, we are in place to ensure the safety and support of each CPS student involved in an allegation presented to our office. As we discussed, we want to move forward in understanding the concerns and experiences of your students and implementing safety and support measures. These measures will be implemented whether your students choose to remain at Lincoln Park, or together, you decide a safety transfer is needed.You can find a list of schools in Network 14 here: Schools by Network. The Network administration is aware and ready to support should either of you seek a safety transfer. You can also explore more school information here: School Profiles.

I will be your primary contact throughout this case and will be here to support all of our next steps. I look forward to speaking with both of you, and your sons, soon. At any point, please do not hesitate to reach out to me with any concerns or questions.

Best,
--

**Brian K. Thompson Jr., LCSW**
Lead Title IX Field Specialist
Office of Student Protections & Title IX
110 N. Paulina Chicago, IL 60622
773-535-4370 (Direct) | 773-535-4400 (OSP Mainline)
773-553-3335 Student Safety Center (operates 24/7)
bkthompson2@cps.edu

[OSP Procedure Manual](#)
[CPS's Non-discrimination policy](#)





**Laura LeMone, EdD**
**Network 14**
lalemone@cps.edu
773-535-8190
West Loop Office - 110 North Paulina St. Chicago, Illinois 60612

June 23, 2020

Dear Lincoln Park Parents and Families,

I hope this email finds you and your loved ones healthy and safe. I am writing today to update you on investigations involving coaches from the Lincoln Park athletics program who were removed from the school in January and February due to allegations of misconduct.

The Office of Student Protections and Title IX and the Office of Inspector General substantiated multiple allegations of serious misconduct at Lincoln Park High School. Based on these findings, the district has decided to file dismissal charges and move forward with a termination hearing for Pat Gordon (school security officer). In addition, the district has revised its discipline recommendation for Donovan Robinson (community relations representative at another CPS high school) and Larry Washington (day-to-day citywide substitute). While misconduct was substantiated, the district determined that it is appropriate for Mr. Robinson and Mr. Washington to return to their respective instructional positions. To ensure understanding of district policies moving forward, Mr. Robinson and Mr. Washington will receive training and support from the Network and the CPS Office of Student Protections and Title IX.

Nothing is more important to us than the safety and well-being of your children. We take all allegations extremely seriously, and these investigations were necessary to ensure that your child's safety will continue to be appropriately safeguarded. With these investigations behind us, I am confident that Lincoln Park will be a stronger and safer school community.

If you have questions, please feel free to contact me at lalemone@cps.edu.

Sincerely,

*Laura LeMone*

Laura LeMone
Chief of Network 14
Chicago Public Schools

**EXHIBIT**
J





Begin forwarded message:

**From:** LINCOLN PARK HIGH SCHOOL <noreply@cps.edu>
**Date:** February 14, 2020 at 5:28:21 PM CST
**To:**
**Subject: New information about the allegations against former LPHS administrators**
**Reply-To:** noreply@cps.edu

A message from LINCOLN PARK HIGH SCHOOL

Dear Lincoln Park HS Students, Families, and Staff,

Earlier this week, along with district leaders, I sat down with members of your local school council and briefed them on the details of several active investigations happening at LPHS. The investigations remain open, and our investigators continue to evaluate additional allegations involving student and staff misconduct that have surfaced recently. While we were limited by our obligation to protect student privacy, the information we shared covered adult misconduct during the 2019-20 school year that has been fully substantiated.

Based on extensive interviews with students, staff, and parents, the district determined that school administrators fostered a dangerous culture for students by disregarding their training and requirements for protecting students and failed to effectively oversee the school's athletic program. Most troublingly, when speaking with investigators, the administrators attempted to minimize the severity of the allegations, and withheld key evidence for nearly a week. An administrator also misled parents of the whistleblowers and falsely claimed that OSP and district officials had reviewed their child's allegations and considered it not troubling. Their mishandling of the situation and lack of candor jeopardized student safety, especially the students who came forward to report the allegations, and further traumatized student survivors.

Protecting students is our highest priority, and we take allegations of misconduct seriously. Our investigation team is led by trained professionals with years of experience handling victim sensitive, trauma informed sexual abuse investigations, and their integrity is unquestioned by experts in the field. In order to successfully build a safe and supportive culture for students who come forward with allegations, students must believe that we will handle their allegation with the utmost care and respect and most importantly, protect them from further harm.

Last night, we were made aware of LPHS's LSC desire to hire an investigator to conduct their own investigation, which is well outside of their role as defined by state law. The LSC does not have the authority to hire their own investigators nor to investigate misconduct, but most importantly, an additional, superfluous investigation would greatly risk retraumatization of the multiple student survivors. Investigators hired by the LSC will be legally prohibited from accessing student records, entering CPS property, or interviewing students and staff. We will not allow additional harm to be done to LPHS students.

I know the events of the past few weeks have been difficult, and the district does not take the removal of school leaders lightly. However, after the series of allegations that our investigators substantiated, we acted swiftly to ensure the

immediate safety of our students. We recognize your community needs significant support during this difficult time, and the district is committed to helping LPHS heal and our SEL and OSP staff are always available if you ever need someone to talk to. I'm committed to working with LPHS to find a productive path forward that supports students, families, and staff.

LaTanya D. McDade
Chief Education Officer
Chicago Public Schools


-----------

Estimados estudiantes, familias y personal de la Escuela Secundaria Lincoln Park:
A principios de esta semana, con los líderes del distrito, conversé con los miembros del consejo escolar local (LSC, por sus siglas en inglés), y les informé sobre los detalles de varias investigaciones activas que se están llevando a cabo en la Escuela Secundaria Lincoln Park (LPHS, por sus siglas en inglés). Las investigaciones siguen abiertas, y nuestros investigadores continúan evaluando otras acusaciones de mala conducta de estudiantes y del personal que han surgido recientemente. Aunque estábamos limitados por nuestra obligación de proteger la privacidad de los estudiantes, la información que compartimos abarcaba la mala conducta de los adultos durante el año escolar 2019-20, que ha sido totalmente corroborada.

Basándose en extensas entrevistas con los estudiantes, el personal y los padres, el distrito determinó que los administradores escolares fomentaron una cultura peligrosa para los estudiantes al ignorar su capacitación y los requisitos para proteger a los estudiantes, y que no supervisaron eficazmente el programa atlético de la escuela. Lo más preocupante fue que, cuando hablaron con los investigadores, los administradores intentaron reducir la gravedad de las acusaciones, y retuvieron pruebas clave por casi una semana. Un administrador también engañó a los padres sobre los denunciantes, y declaró falsamente que la Oficina de Protección Estudiantil (OSP, por sus siglas en inglés) y los funcionarios del distrito habían revisado las acusaciones de su hijo y habían considerado que no eran preocupantes. El mal manejo de la situación y la falta de franqueza pusieron en peligro la seguridad de los estudiantes, especialmente la de los estudiantes que se presentaron para denunciar las acusaciones, y traumatizaron aún más a los estudiantes sobrevivientes.

Proteger a los estudiantes es nuestra máxima prioridad, y tomamos seriamente las acusaciones de mala conducta. Nuestro equipo de investigación está dirigido por profesionales capacitados con años de experiencia en el manejo de investigaciones de abuso sexual, que son sensibles y traumáticas para las víctimas. Por lo tanto, la integridad de estos profesionales resulta incuestionable para los expertos en el ámbito. A fin de crear exitosamente una cultura segura y acogedora para los estudiantes que presentan denuncias, los estudiantes deben confiar en que manejaremos sus acusaciones con el mayor cuidado y respeto y, sobre todo, en que los protegeremos de mayores daños.

Anoche, nos enteramos de que el LSC de la LPHS deseaba contratar a un investigador para llevar a cabo su propia investigación, lo cual solo es aceptable cuando esto se hace fuera de su función, como lo define la ley estatal. El LSC no tiene la autoridad para contratar a sus propios investigadores ni para investigar la mala conducta. Pero lo más importante es que una investigación adicional e innecesaria aumentaría la posibilidad de que algunos de los estudiantes sobrevivientes se vuelvan a traumatizar. Si el LSC decide proceder, se les prohibirán legalmente a sus investigadores a que accedan a los registros estudiantiles, a que ingresen a la propiedad de la CPS, o a que entrevisten a los estudiantes y al personal. No permitiremos que se cause un daño adicional a los estudiantes de la LPHS.

Estoy consciente de que los eventos de las últimas semanas han sido difíciles, y el distrito no toma a la ligera el despido de los líderes escolares. Sin embargo, después de la serie de acusaciones que nuestros investigadores corroboraron, actuamos rápidamente para asegurar la seguridad inmediata de nuestros estudiantes.

Reconocemos que su comunidad necesita recibir apoyo significativo durante este difícil momento, y el distrito está comprometido a ayudar a la LPHS a superar los eventos de las últimas semanas.


LaTanya D. McDade
Directora de Educación
Escuelas Públicas de Chicago